BRICE D. ARMOUR *vs.* KATHERINE DOONAN, *Ex.*

JULY 22, 1935.

PRESENT:   Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

CAPOTOSTO, J. This is an action of assumpsit brought against the executrix of the will of Caroline Armour to recover for rent of a house at 14 Dover street, in the city of Providence, from June, 1921, to June, 1928, at a yearly rate of $500 under an alleged agreement between the testatrix and the plaintiff for the payment of such rent. It was heard by a justice of the superior court without a jury and resulted in a decision for the plaintiff for $3,176.80. It is now before us upon only one exception, which was taken by the defendant to this decision, on the grounds that it is against the law and against the evidence and the weight thereof.

We will first consider the parties, their connection with the property in question and the dates of a few fixed events. Brice, Obadiah, and William Armour were brothers. The deceased, Caroline Armour, was the wife of Obadiah. The house at 14 Dover street originally stood in his name alone. In June, 1900, the plaintiff brought suit against Obadiah, attached the property in question and later became the title holder thereof by sheriff's deed dated November 27, 1901. By quitclaim deed of October 17, 1925, the property was transferred by the plaintiff to one Domenic Annotti, and the latter deeded it later to one Millard Anderson, who in turn gave a deed back to the plaintiff. The deeds to Annotti and Anderson were duly recorded but the deed from Anderson to the plaintiff was never put on record. The plaintiff has been a business man all his life, and in the brokerage and real estate business for the last ten or twelve years.

William died in 1921. By the terms of his will, Obadiah received $250 a year from his estate, which sum was increased to $500 upon the death of William's wife in 1925. Obadiah and his wife, Caroline, continued to occupy one of the two tenements at 14 Dover street until Obadiah's death on March 4, 1928. She moved away from the premises a month or two later, and on October 25, 1932, she died, leaving a will which was probated November 18, 1932, by the probate court of the city of Providence. Letters testamentary were issued to Katherine Doonan, the present defendant, and she filed an inventory which showed a personal estate of $34,640.99. The plaintiff filed his claim in the sum of $4,368.69 against the estate on April 19, 1933. The claim was disallowed the following day and notice of disallowance promptly given to the plaintiff, who, by writ dated June 22, 1933, brought the present action.

The testimony shows that from 1901, when the plaintiff became the title holder of the property under a sheriff's deed, until 1921, he received only one month's rent in all that time for the upper tenement, and no rent whatever for the lower tenement in which his brother Obadiah and his wife, Caroline, lived, although the plaintiff says he asked his brother several times "for some money." The plaintiff testified that about June, 1921, he inquired of Obadiah what he wanted to do about paying rent and that his brother would give him no answer until he consulted his wife; that he waited several days and then "went to see Caroline and put it to them. They had always lived there and didn't want to move, and I hadn't the heart at that time of life to say 'I will sell the house, and whoever buys it might put you out,' and we came to the conclusion that they would pay rent." In another part of the testimony, referring to this same meeting, the plaintiff testifies: "I told her I was getting out of business, and the real estate was in demand and I had an offer for it and wanted to sell, that I was going to California to live. And Caroline said

that she had always lived there and hated the idea of having somebody else buying it and having to move somewhere else at her time of life. She was around sixty years of age at the time. We talked back and forth and I thought perhaps it was rather of an injustice to put them out of the tenement at the time, so the final talk was, I would rent the house to her, for five hundred dollars a year." He also testified that the question as to who was to make or be liable for a certain type of repairs was agreed to at that time by himself and Caroline.

Speaking both of the contract for the rent and of the repairs, the plaintiff at different times used the pronouns "we" and "they," and this led to the following questions and answers: Q. "Who do you mean by 'we?'" A. "Caroline would." Q. "You used the words 'we' and 'they' several times." A. "Yes, Sir. I don't know why I should. It is simply a mistake. I should say Caroline." Q. "You don't describe a certain person by the word 'they' do you?" A. "I ought not to but I did." In explaining how he came to make the agreement with Caroline rather than with his brother, the plaintiff says: "Caroline Armour held the pocketbook, and I considered the agreement made with my brother wouldn't amount to so very much. She was the cashier. It was her that paid the bills, and I didn't think his contract would amount to so very much, and that is why the agreement was made with her."

Between 1901 and 1921, the plaintiff received no income, with the possible exception of one month's rent, from this property, and after the alleged agreement of June, 1921, until 1928, when Obadiah died, he did not receive one cent in rent for either tenement, although he testified that he himself paid the taxes and insurance ever since he got title in 1901. He explained this by saying that Obadiah was his favorite brother, that he would not evict him, that, on several occasions after 1921, he had asked Caroline for the rent but was put off by one excuse or another, and that he

would not sue his sister-in-law after his brother died, even though he knew at the time that she owned various parcels of real estate in Providence and in Buttonwoods. He also stated that soon after Obadiah's death, he "collected the rent because she surrendered her agreement."

This case was tried in the superior court in March, 1934. John A. MacDonald, a witness for the defendant, testified that he rented one of the tenements at 14 Dover street from Obadiah Armour in June, 1926, that he always paid his rent to Obadiah and received a receipt signed by Obadiah and this plaintiff, and that after Obadiah died he paid the rent to the plaintiff and has done so ever since.

George H. Darby, who also testified for the defendant, stated that he lived across the street from Obadiah Armour, that his wife and Caroline Armour were friends, and that on one occasion, when he was in his parlor reading the paper and his wife and Caroline were there talking, he heard Caroline say to his wife that the plaintiff did not collect any rent for the house and that he had told her that she and her husband could live in the house "as long as they lived, free of rent . . . but they had to keep the house in repair." This witness stated that Mrs. Darby, who did not testify, had been a confirmed invalid and unable to leave the house for some time. The plaintiff did not attempt in any way to impeach this statement with reference to Mrs. Darby's physical condition.

In direct examination, Mr. Darby placed the time when he heard this statement by Caroline Armour as "maybe ten years ago." In cross-examination counsel for the defendant unsuccessfully tried to have him extend the time to fourteen or fifteen years, although the witness did admit that it might be thirteen years; and in rebuttal, the plaintiff himself, in answer to a question from his counsel with reference to the testimony of Mr. Darby, said: "His statement was practically correct except the date. My brother died and Caroline put on a poor mouth and I didn't want my neighbors saying that I put my brother's

widow out of her house, and I did say to Caroline, 'If you haven't any money and you want to stay here, you stay here. I won't put you out.'" The brother died in 1928, or less than six years before the trial.

Katherine T. Doonan, a second cousin of Caroline, one of four residuary legatees under her will and the executrix thereof, testified that, although she had been a frequent visitor at 14 Dover street up to the death of Obadiah, she had never discussed with Caroline "in any manner the matter of this estate, the rent, or how they occupied it"; that after Obadiah's death, when Caroline told her she was going to break up her home, she invited Caroline to come and stay with her, as her sister had died a short time before; that since Caroline expressed some doubt as to what she would do, she asked Caroline why she did not stay where she was and that Caroline answered that "Mr. Brice Armour said she could stay there as long as she lived, but she must not touch the rents downstairs. So I said 'Why don't you stay?' 'Oh, no,' she said, 'I would feel too bad.'" The record shows that previous to this time Obadiah and his wife were occupying the tenement upstairs.

Miss Doonan also testified that Caroline told her, in answer to her questions, that the house was not in her name, that she had never "signed off," that "she did not have any rent to pay," that her husband and his brother, the plaintiff, attended to all matters including the collection of the rent for the other tenement, that she was never consulted in any way, and that everything was done "underhanded."

It further appears from the testimony of Miss Doonan that Caroline Armour went from 14 Dover street to the "St. Marie Home" for aged women, for three years, then lived for about one year in one of her own houses, and finally came to stay with her, some ten days before she died at the age of over 81 years; that Caroline Armour always paid her bills promptly and that the only other claim filed against her estate beside that of the plaintiff's

was a bill for some work done shortly before her death.

At the end of the trial on March 20, 1934, the justice reserved decision, stating that the case was a "peculiar one." His rescript of April 2, 1934, after referring to the facts in a general way, concludes with the finding in favor of the plaintiff, which the defendant now claims is not supported by the credible evidence or the weight thereof. The justice in his rescript does not discuss the evidence and does not give any information, either to the parties or to this court, as to the reasons that led him to his conclusion, unless we are to assume that he acted upon the uncorroborated statements of the plaintiff as the only real evidence in the case. In the interest of all concerned, therefore, we have given this case special attention and have set out the testimony at the trial with greater particularity than should ordinarily be expected of us.

The plaintiff rests his claim squarely upon a definite agreement said to have been made between Caroline Armour and himself about June, 1921. The burden is upon him to establish this contract by a fair preponderance of the credible evidence. A statement under oath in the course of a trial is testimony in the case, but it does not necessarily follow that such a statement must be accepted as determinative evidence upon a vital issue, irrespective of surrounding circumstances that strongly tend to deny the truth of the assertion. A sound judgment from the testimony can only be formed after mature consideration of what is said and done; either may explain the other, but each must be regarded as a component part of the other and both must be considered in the light of reason and probability before the testimony can be given probative value.

In the case at bar there is no testimony of any such agreement as the plaintiff claims save the plaintiff's own statement to that effect. This does not in itself discredit his testimony, in spite of the fact that he is interested in the result of the case. But it does call for a close scrutiny

of the surrounding conditions and the conduct of the parties in their dealings with each other, both before and after the making of the alleged agreement, especially in a case where one can freely speak for himself and the other is silenced by death. In determining whether or not a fact or state of facts existed at a given time or during any period, the reasonableness of the testimony and its consistency with itself and other proven circumstances, especially if they are established by conduct over many years, are considerations of the highest importance and should not be overlooked or disregarded in testing the credibility of a claim.

The inconsistencies in this record are obvious and serious. In one breath the plaintiff claims to have rented the property to Caroline Armour and in the next he says that Obadiah "was to get as much for the lower tenement as he could. He could give it away or get as much as he could. He was my brother." In another place he says that he did not have the heart to subject his brother and his wife to possible eviction if he sold the premises, so "we came to the conclusion that they would pay rent." The transcript shows many other instances of a similar misuse of pronouns in the plaintiff's testimony in reference either to the alleged contract or the repairs. We find it difficult to ascribe this to mere inadvertance in a man of the plaintiff's education, training and experience, especially in real estate matters.

It is significant that notwithstanding the plaintiff's desire to get some income from the property, which he claims as the reason for his agreement with Caroline Armour, he received no more from 1921 to 1928 than he did between 1901 and 1921, and that was nothing. Obadiah Armour and his wife, Caroline, paid no rent up to 1921, and they paid no rent after that date. We are not impressed by the plaintiff's statements that he was deterred from any action against Caroline because of her financial condition. The plaintiff well knew at all times that she was the owner of real estate, both in Providence and Buttonwoods, which

was ample to satisfy his claim for rent whenever he saw fit to assert it.' But, he says, that he would not bring any action that might disturb his brother nor would he sue his sister-in-law. This does not ring true, for he did take this very house, at least on paper, from his brother by legal proceedings in 1901, and he has shown no hesitation in suing his sister-in-law's estate in 1933. We are asked to believe that the failure of the plaintiff to make a claim under this agreement against Caroline Armour in her lifetime, when she would have had a chance to defend her interests in person, was due to charitable considerations. The evidence does not warrant us in believing this.

Long delay in presenting or prosecuting a claim is evidence against its validity, especially when the claim is not asserted in the lifetime of the alleged debtor and is further rebutted by inconsistent conduct on the part of the claimant over a term of years. Actions of this character, when one party to the transaction has deceased, call for the closest scrutiny. 24 C. J. 400. *Gilmore* v. *Prior*, 52 R. I. 395. In *Gorton* v. *Johnson*, 23 R. I. 138, the court, at page 142, says: "Courts and juries should scan the evidence in such a case with special care, so as to prevent the estates of deceased persons from being unjustly mulcted in damages."

The proof, in order to support a verdict against an estate, must be clear and convincing. *Hobin* v. *Hobin*, 33 R. I. 249, 256; *McAtee* v. *Jackson*, 157 Atl. (R. I.) 305; *Mowry* v. *Dean*, 51 R. I. 156. Either party or witness may be contradicted by extrinsic facts as completely as by direct testimony. A claim is not to be held as proven merely because there is no direct testimony contradicting it, if such a claim contains inherent improbabilities or contradictions, which alone, or in connection with other established facts, tend to prove its invalidity. *Heltzen* v. *Union R. R. Co.*, 26 R. I. 576, 577; *Gorman* v. *Hand Brewing Co.*, 28 R. I. 180, 183; *Whalen* v. *Dunbar*, 44 R. I. 136.

Tested by these principles, the evidence in this case which in our judgment is most worthy of belief not only does

not support the plaintiff's claim but strongly tends to disprove it. While the findings of fact made from conflicting testimony by a justice sitting without a jury are entitled to great weight such findings when clearly wrong will be set aside. Even after making all reasonable allowance for the fact that the trial justice saw the witnesses and heard them testify, we are of the opinion that the evidence is not sufficiently clear and convincing as to justify a decision for the plaintiff.

The defendant's exception is sustained.

The plaintiff may, if he shall see fit, appear on October 9, 1935, and show cause, if any he has, why the case should not be remitted to the superior court with direction to enter judgment for the defendant.

*William M. P. Bowen*, for plaintiff.

*James M. Gillrain* and *John M. Clifford*, for defendant.